**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| ANDERSON ENERGY GROUP (OHIO), LLC, an Oklahoma limited liability company, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 12-CV-430-GKF-TLW |
| ENDEAVOR, OHIO, LLC, a Texas limited liability company; and ENDEAVOR ENERGY RESOURCES, LP, a Texas limited partnership, | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the court is the Motion to Dismiss [Dkt. #30] filed by defendants Endeavor Ohio, LLC ("EO"), and Endeavor Energy Resources, LP ("EER"). Defendants seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(2), based on lack of personal jurisdiction and improper venue. Alternatively, they seek transfer of the case to the United States District Court for the Northern District of Texas. Additionally, defendants move for dismissal of plaintiff's fourth claim for tortious interference with contract pursuant to Rule 12(b)(6).

### I. Facts

This is a dispute over an alleged agreement between plaintiff, Anderson Energy Group (Ohio), LLC ("Anderson") and EO, for Anderson to help EO sell oil and gas lease acreage in Ohio to Carrizo (Utica) LLC ("Carrizo"). Anderson contends EO agreed to pay it $200.00 for each acre acquired by Carrizo.

**A. Allegations of the Complaint**

Anderson is an Oklahoma limited liability company with its principal place of business in Tulsa. [Dkt. #2, Complaint, ¶ 1]. EO is a Texas limited liability company with its principal place of business in Dallas, Texas. [*Id.*, ¶2]. EER is a Texas limited partnership with its principal place of business in Midland, Texas. [*Id.*, ¶3]. EO is alleged to be a wholly-owned subsidiary of EER. [*Id.*, ¶12].[1]

Anderson alleges it entered into an agreement with EO whereby Anderson agreed to provide "personal services" to assist EO in connection with the potential sale of oil and gas lease acreage to Carrizo. In exchange, EO agreed to pay Anderson $200 for each acre closed by Carrizo. [*Id.*, ¶5].

Anderson alleges that when the contract of sale between EO and Carrizo approached closing, EO's president, Ron Broadway, sent Anderson a written agreement memorializing the agreement. In the email accompanying the agreement, Broadway stated, "Once you have reviewed and agreed to format I will print and execute." [*Id.*, ¶6]. Anderson responded with "minor revisions" to the written agreement. [*Id.*, ¶7]. Instead of receiving the executed agreement, Anderson received an email from John Calce, co-founder and Chairman of EO, in which Calce stated that the agreement could not be executed given "the time frame we are dealing with." [*Id.* ¶8]. However, Calce "was careful to acknowledge that, regardless of the alleged inability to execute a more formal writing, an enforceable agreement existed that ensured payment to Anderson" and stated, "… [EO] has paid brokers millions of dollars in commissions for helping with transactions in Ohio with no agreement other than a handshake. If you can help Carrizo issue [EO] a contract to purchase the ~7000 acres we discussed on Friday (and if they

[1] According to the Declaration of Ron Broadway, EER owns a 50 percent membership interest in EO, and the other two minority members are companies formed under the laws of the State of Texas with their principal places of business in Texas. [Dkt. #30, Ex. A.1., Broadway Dec., ¶5].

can close within 30 days on terms acceptable to [EO] we can assure you that you will be paid $200 per acre of those ~7000 acres that are actually closed by Carrizo." [*Id.*].

Anderson alleges it performed all of its duties and obligations under the agreement and as a result of its services, Carrizo agreed to purchase a substantial number of oil and gas lease interests from EO, with the first part of the sale having closed on August 1, 2012. [*Id.*, ¶11]. On July 30, 2012, Anderson received an email from Mike Short, General Counsel and Vice President, Land, of EER. [*Id.*, ¶12]. Short did not claim to be general counsel for EO. [*Id.*]. In the email, Short stated that he had "been provided nothing that indicates that there is any authorized or unauthorized agreement that establishes your right to receive a commission of any kind," and told Anderson, "[i]f you interfere with or cause the delay of the scheduled Carrizo closing in any manner, [EO] will take all immediate steps necessary and required to protect its interest," including the filing of suit for "injunctive relief, tortuous [*sic*] interference, declaratory relief and damages." [*Id.*, ¶13]. In subsequent emails and phone conversations on July 30-31, Camp continued to threaten litigation, "demanded that [Anderson] provide 'a General Release' for any commission," and "stated that if the closing with Carrizo did not proceed as scheduled Mr. [Sid] Anderson [Anderson's managing member] would be 'Target One.'" [*Id.*, ¶¶14-17].

Anderson asserts claims for declaratory judgment and breach of contract against EO, a claim of unjust enrichment against EO and EER and a claim of tortious interference with contract against EER. It seeks actual damages against both defendants and punitive damages against EER.

**B. Witness Declarations/Affidavits**

Ron Broadway and John Calce, the president and chairman, respectively of EO, submitted declarations and Sid Anderson submitted an affidavit in connection with the pending motion.

Broadway states that EO was formed in October 2011 under the laws of the State of Texas to buy, sell and develop oil and gas interests in the State of Ohio; its principal place of business is in Dallas and it also maintains offices in Ohio. [Dkt. #30, Ex. 1, Broadway Dec., ¶¶1-2]. EER, a Texas limited partnership with its principal place of business in Midland, Texas, owns a 50 percent membership interest in EO; the two other minority members are companies formed under the laws of the State of Texas with their principal places of business in Texas. [*Id.*, ¶¶4-5]. In the fall of 2011, EER and EO owned oil and gas mineral interests in Ohio; EER's interests were subsequently assigned to EO after its formation in October 2011. [*Id.*, ¶6].

EO is not licensed to do business in Oklahoma, does not conduct business in Oklahoma and has no members who reside in Oklahoma. [*Id.*, ¶7]. All business conducted by EO occurs in the States of Texas and Ohio. [*Id.*]. EO does not maintain bank accounts or pay taxes in Oklahoma; it does not maintain a phone or facsimile listing, nor does it advertise in Oklahoma. [*Id.*, ¶10]. It has no employees located in Oklahoma and prior to commencement of this litigation, no officer or employee of EO ever traveled to Oklahoma for any matters related to the subject of Anderson's claims. [*Id.*, ¶¶11-12].

EER operates oil and gas wells in several states including Oklahoma, "but those operations are unrelated to EO or any claims of Plaintiff." [*Id.*, ¶13].

In August 2010, Sid Anderson, a Tulsa attorney, certified public accountant and businessman, formed Anderson Energy Group LLC ("AEG"), an Oklahoma limited liability

company specializing in the acquisition, development and management of oil and natural gas properties. [Dkt. #31, Ex. A, Anderson Affid., ¶¶3-5,7]. He formed the plaintiff LLC, Anderson, to specialize in the acquisition, development and management of oil and natural gas properties in the state of Ohio. [*Id.*, ¶8]. Both AEG and Anderson have their principal, and only, place of business in Tulsa. [*Id.*, ¶¶7-8].

Broadway and Sid Anderson have been acquaintances for a number of years. [Dkt. #30, Ex. 1, Broadway Dec., ¶14]. On October 22, 2011, as a result of negotiations between the two, the plaintiff entered into a Letter of Intent ("LOI") with EER regarding plaintiff's purchase of EER oil and gas interests in Ohio. [*Id.*, ¶¶15-16].[2] The LOI granted Anderson the right to perform due diligence with respect to the properties, and EER agreed to cooperate by providing information concerning the ownership of the assets. [Dkt. #31, Ex. A, Anderson Affid., ¶11; Ex. A-2, LOI]. Sid Anderson traveled to EO's offices in Dallas on several occasions to discuss the prospective purchase and negotiate a letter of intent. [Dkt. #30, Broadway Dec., ¶15]. The LOI provided for a closing date of January 25, 2012. [Dkt. #31, Ex. A-2, LOI].[3] The plaintiff never consummated its purchase of any EER or EO Ohio interests and no claims have been asserted under the LOI. [Dkt. #30, Ex. 1, Broadway Dec., ¶18].[4]

Before June 12, 2012, EO had begun to contact prospective purchasers to advise them of EO's desire to sell some of its oil and gas interests in Ohio. [*Id.*, ¶19]. On June 12, 2012, Sid

---

[2] Broadway states that Sid Anderson initially approached him about the Ohio properties in October 2011. [Dkt. #30, Ex. A, Broadway Dec., ¶15]. Sid Anderson states that Broadway first approached *him* about the properties in April 2011. [Dkt. #31, Ex. A, Anderson Affid., ¶10].

[3] During the same timeframe, either Sid Anderson or the plaintiff LLC entered into a letter of intent with Carrizo Oil and Gas, Inc. ("Carrizo"), a company with headquarters in Houston, Texas, for the sale of some of the interest Anderson proposed to buy from EER. [Dkt. #30, Ex. A, ¶17].

[4] Sid Anderson states in his affidavit: "Ultimately, I learned why [EER] could not deliver the information, notwithstanding its representations in the LOI: many of the assets which were the subject of the LOI were not even owned by [EER], but were rather owned by [EER's] affiliate, Endeavor Ohio. [*Id.*, ¶15].

Anderson contacted Broadway regarding the possibility of assisting EO with the sale of its interests that had been the subject of the LOI. [*Id.*, ¶20] He indicated he had a buyer who was familiar with the properties and was interested in buying them. [*Id.*]. On Friday, June 15, 2012, Sid Anderson flew from Tulsa to Dallas and met with Broadway and Calce in EO's offices in Dallas. [*Id.*, ¶¶20-21]. The three men discussed the general terms under which EO would be willing to sell three specific groups of properties to the potential buyer, Carrizo, provided that certain conditions were met, including the need to close the transaction on or before July 30, 2012. [*Id.*, ¶21]. Sid Anderson states in his affidavit that "[t]o facilitate that new agreement, Endeavor Ohio's Chairman, Calce, sent acreage maps of the Ohio properties to Anderson's offices in Tulsa." [Dkt. #31, Ex. A, Anderson Affid., ¶18]. Calce states in his declaration that during the June 15, 2012 meeting in Dallas, Mr. Anderson was provided copies of the maps regarding the EO properties that were to be shown to Carrizo the following Monday in Houston; otherwise, he did not provide any maps to Mr. Anderson that were contemplated to have been presented to Carrizo. [Dkt. #35, Ex. A, Calce Dec., ¶4].

Before Mr. Anderson left the meeting, he requested a written agreement for representation in advance of a meeting he had tentatively scheduled with Carrizo to occur the following Monday; Broadway told him EO would prepare and forward an agreement reflecting the terms that had been reached in principle. [Dkt. #30, Ex. 1, Broadway Dec., ¶22]. Later that day, Broadway emailed Mr. Anderson a proposed "Commission Agreement" between EO as "Client" and Mr. Anderson as "Broker" that contained the terms discussed in their meeting. [*Id.*, ¶22; Ex. A to Broadway Dec., Commission Agreement]. The Commission Agreement had a July 20, 2012, deadline for closing the sale between EO and Carrizo. [*Id.*, Ex. A]. Two days later, on Sunday, June 17, 2012, Mr. Anderson responded by email, attaching a different draft

agreement titled "Service Agreement," and stating, "This more closely reflects what my understanding of our agreement is . . . . I called this a service agreement because some states have funny rules about getting a commission of real estate and mineral leases are considered to be real estate in most oil and gas producing states." [*Id.*, ¶24; Ex. B. to Broadway Dec., Service Agreement]. Mr. Anderson's proposed Service Agreement extended the closing date to December 31, 2012, and expanded the scope of the agreement to other leases beyond those originally discussed. [*Id.*, ¶25; Ex. B]. Neither the Commission Agreement nor the Service Agreement was ever executed by either party. [*Id.*, ¶¶23, 25]. On Sunday evening, June 17, Calce responded by email to Mr. Anderson's proposal, stating, "In order to sign an agreement like that we would have to send it to Midland to be reviewed by Mike Short and given our current other interest and the time frame we are dealing with, that isn't going to happen." [*Id.*, ¶26; Ex. 1.C, Calce email to Anderson].[5] The three men exchanged additional emails later that evening. [*Id.*; Ex. 1.C.].

The next day—Monday, June 18, 2012—Mr. Anderson flew to Houston and met with Carrizo "to effectuate the sale of property from Endeavor Ohio to Carrizo and called Broadway to advise him that Carrizo would be contacting him to directly discuss the transaction." [Dkt. #31, Ex. A, Anderson Dec., ¶24]. Between June 18 and July 10, 2012, Anderson exchanged eight emails with Carrizo's landman regarding the EO properties. [*Id.*, ¶25; Ex. A-11].

---

[5] In the email, Calce also stated:

> As we discussed on Friday, Endeavor Ohio is already speaking with Carrizo through their capital partner, Avista. That being said, Endeavor Ohio has paid brokers millions of dollars in commission for helping with transactions in Ohio with no agreement other than a handshake. If you can help Carrizo issue Endeavor Ohio a contract to purchase the ~7000 acres we discussed on Friday (and if they can close within 30 days on terms acceptable to Endeavor Ohio) we can assure you that you will be paid $200 per acre of those ~7000 acres that are actually closed by Carrizo. There is no way we are able to provide you with any commitment beyond that for any time frame longer than this coming Friday as we are exploring other options with respect to partners or purchasers.

[Dkt. #30, Ex. 1.C].

On July 30, 2012, Mr. Anderson received a series of emails from Short, in which Short advised him he had not been provided with any written agreement that established Mr. Anderson or plaintiff had any right to claim a commission on the contracted Carrizo closing, which was set for the next day; that neither Broadway nor Calce had authority to agree to such a commission; that EO intended to pursue its closing with Carrizo and it intended "for those closings to go smoothly, on time, and without interference from any outside third party." [*Id.*, ¶¶26-27; Ex. A-12, A-13, Short to Anderson emails]. In another email the same day, Short "offered, apparently on behalf of [EO], to visit with me by phone to discuss a 'reasonable payment in exchange for the General Release.'" [*Id.*, ¶28]. However, when Mr. Anderson called Short, "Short dominated the conversation, did not discuss in good faith a resolution, and threatened that [Mr. Anderson] would be 'Target One' if the closing with Carrizo were delayed ." [*Id.*, ¶28; Ex. A-15, Transcript].

The principals of EER, EO and Carrizo knew that plaintiff Anderson was located in Tulsa when they entered into negotiations and agreements with Anderson regarding the Ohio oil and gas interests. [Dkt. #31, Ex. A, Anderson Affid., ¶30].

## II. Rule 12(b)(2) Motion

### A. Applicable Law: Requirements for Personal Jurisdiction

In considering a motion to dismiss pursuant to Rule 12(b)(2), a court must determine whether the plaintiff has alleged sufficient facts to establish the court's personal jurisdiction over the defendant. Plaintiff bears the burden of establishing that the court has personal jurisdiction over defendants. *OMI Holdings, Inc. v. Royal Ins. Co. of Canada,* 149 F.3d 1086, 1091 (10th Cir. 1998); *AST Sports Science, Inc., v. CLF Dist. Ltd.*, 514 F.3d 1054, 1056 (10th Cir. 2008). However, where, as here, the question of personal jurisdiction is disputed in the preliminary

stages of litigation, "the plaintiff need only make a prima facie showing of jurisdiction to defeat the motion [to dismiss]." *AST Sports Science*, 514 F.3d at 1056. The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant. *OMI Holdings*, 149 F.3d at 1091. The court will accept as true the allegations in plaintiff's complaint, and all factual disputes will be resolved in the plaintiff's favor. *Intercon Inc. v. Bell Atl. Internet Sol'ns*, 205 F.3d 1244, 1247 (10th Cir. 2000) (quoting *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995)).

"To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state *and* that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1074 (10th Cir. 1995). "In Oklahoma, this two-part inquiry collapses into a single due process analysis," because Oklahoma permits the exercise of personal jurisdiction to the full extent permitted by the United States Constitution. *Rambo v. American S. Ins. Co.*, 839 F.2d 1415, 1416 (10th Cir.1998) (citing Okla. Stat. tit. 12, § 2004 F). Accordingly, the only question remaining is whether the exercise of personal jurisdiction over the nonresident defendant comports with due process. *See AST Sports Science*, 514 F.3d at 1057.

The Due Process Clause prevents courts from exercising jurisdiction over a nonresident defendant unless "there exist 'minimum contacts' between the defendant and the forum state." *Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004) (quoting *OMI Holdings*, 149 F.3d at 1091). The "minimum contacts" standard can be satisfied in either of two ways: First, the court may exert specific jurisdiction over a defendant who has "purposefully directed his activities at residents of the forum," provided "the litigation results from alleged injures that arise out of or relate to those activities." *Id.* (internal citations and quotation marks omitted).

Alternatively, the court may maintain general personal jurisdiction over a defendant who has maintained continuous and systematic general business contacts with the forum state. *Id.*

**B. Analysis**

Both EO and EER assert the court lacks either general or specific personal jurisdiction over them. Anderson contends the court has specific personal jurisdiction over EO and both general and specific personal jurisdiction over EER.

**1. EO**

The specific jurisdiction inquiry is a two-step process. Under the first step, the court must determine whether the defendant has "purposefully directed his activities at residents of the forum" and whether "the litigation results from the alleged injuries that arise out of or relate to those activities." *Benton v. Cameco Corp.*, 375 F.3d at 1075 (quoting *OMI Holdings*, 149 F.3d at 1092). If the first step is satisfied, the court must then consider whether the exercise of personal jurisdiction offends traditional notions of fair play and substantial justice." *Pro Axess, Inc. v. Orluz Distribution, Inc.*, 428 F.3d 1270, 1276-77 (10th Cir. 2005). "This latter inquiry requires a determination of whether the district court's exercise of personal jurisdiction over a defendant with minimum contacts is 'reasonable' in light of the circumstances surrounding the case." *OMI Holdings*, 149 F.3d at 1091.

Anderson urges the court to consider facts related to the LOI between EER and Anderson. However, the Tenth Circuit has stated:

> To determine whether a nonresident defendant has purposefully established minimum contacts with the forum state by contracting with another party, we . . . examine prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing. That is, the contract relied upon to establish minimum contacts must have a substantial connection with the forum state.

*T.H Agriculture & Nutrition, LLC v. ACE European Group Ltd.*, 488 F.3d 1282, 1288 (10th Cir. 2007) (quotations and citations omitted).

In this case, although EER had previously executed an LOI with Anderson, EO's contacts with Anderson are limited to a narrow window of time—June 12 to July 31, 2012—during which Anderson and EO engaged in negotiations concerning the sale of EO mineral interests to Carrizo, and Anderson's potential role as a broker. The court examines the parties' conduct and course of dealing during this time period.

Several factors weigh against a finding that EO purposefully availed itself of the privilege of conducting business within Oklahoma. First, it is undisputed that Anderson, rather than EO, initiated discussions regarding the commission agreement. *See AST Sports Science,* 514 F.3d at 1059 (finding it "especially significant" that defendant approached plaintiff about becoming a distributor); *Pro Axess,* 428 F.3d at 1277 (defendant's solicitation of plaintiff was "some evidence suggesting purposeful availment"); *OMI Holdings, Inc.*, 149 F.3d at 1092 ("[C]ourts have been unwilling to allow states to assert personal jurisdiction over foreign defendants where the defendant's presence in the forum arose from the unilateral acts of someone other than he defendant."). Second, there is no dispute that the transaction contemplated by the parties involved the sale of Ohio properties by a Texas company to another Texas company. The only connection of the transaction to Oklahoma is that Anderson, which was to act as a broker, is located in Tulsa. And significantly, Mr. Anderson, on behalf of plaintiff, traveled to Dallas to discuss the proposed deal, and to Houston to meet with Carrizo, the buyer. Additionally, although no written agreement was executed, draft agreements prepared by both EO and Anderson provided for arbitration of disputes in Dallas and that the contract would be construed and governed by Texas law. Taking as true the allegations in Mr. Anderson's affidavit, EO's

only contacts with Oklahoma were (1) Calce sending maps of the properties to Anderson in Tulsa; (2) a handful of emails from June 15-17, 2012, between Mr. Anderson on behalf of plaintiff and Broadway and Calce on behalf of EO; and (3) emails between Short and Mr. Anderson on July 30-31, 2012, and a telephone call between Mr. Anderson and Short, which Mr. Anderson initiated. These few contacts were incidental to a transaction that otherwise involved activity occurring entirely in Texas for the purchase/sale of Ohio property. They do not establish EO purposefully availed itself of the privilege of doing business in Oklahoma. *See Soma Medical Intern. v. Standard Chartered Bank*, 196 F.3d 1292 (10th Cir. 1999) ("It is well-established that phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts."). Finally, the alleged breach of the agreement occurred in Texas when EO refused to pay commissions to Anderson.

Further, even if the court were to conclude EO purposefully availed itself of the privilege of doing business in Oklahoma, the second factor—whether the exercise of personal jurisdiction offends traditional notions of fair play and substantial justice—weighs against exercise of jurisdiction over EO. *See Pro Axess*, 428 F.3d at 1276-77 (10th Cir. 2005). In light of the limited contacts EO had with Oklahoma during the time events related to the transaction unfolded, and the focus of activity in Texas, the court finds exercise of personal jurisdiction would not be "reasonable." *See OMI Holdings*, 149 F.3d at 1091.

Anderson has failed to makie a prima facie showing that EO's conduct and connection with the forum state were such that it should have reasonably anticipated being haled into court in Oklahoma for an alleged breach the parties' agreement. Therefore, EO's motion to dismiss for lack of personal jurisdiction must be granted.

**2. EER**

**a. Specific Jurisdiction**

Anderson contends the court has specific personal jurisdiction over EER based on emails on July 30-31, 2012, and a telephone call between Short and Mr. Anderson, during which Short threatened to sue Anderson and that Mr. Anderson would be "Target One" if they prevented the closing of the sale of EO Ohio properties to Carrizo.

"The mere allegation that an out-of-state defendant has tortiously interfered with contractual rights . . . does not necessarily establish that the defendant possesses the constitutionally required minimum contacts." *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1079 (10th Cir. 1995). The court is not persuaded the communications between Short and Sid Anderson establish that EER purposefully availed itself of the privilege of conducting business in Oklahoma. Therefore, it rejects Anderson's claim that the court has specific personal jurisdiction over EER.

**b. General Jurisdiction**

Because general jurisdiction does not involve contacts with the forum state directly related to the lawsuit, "courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's 'continuous and systematic general business contacts'" with the forum state. *OMI Holdings, Inc.*, 149 F.3d at 109 (citation and quotation marks omitted). When evaluating whether a defendant has established general contacts with a particular forum, courts have considered, among other things, the following 12 factors: (1) Whether the defendant conducts business in the state; (2) whether the defendant is licensed to conduct business in the state; (3) whether the defendant owns, leases, or controls property or assets in the state; (4) whether the defendant maintains employees, offices, agents, or bank

accounts in the state; (5) whether the defendant's shareholders reside in the state; (6) whether the defendant maintains phone or fax listings in the state; (7) whether the defendant advertises or otherwise solicits business in the state; (8) whether the defendant travels to the state by way of salespersons or other representatives; (9) whether the defendant pays taxes in the state; (10) whether the defendant visits potential customers in the state; (11) whether the defendant recruits employees in the state; and (12) whether the defendant generates a substantial portion of its national sales or income through revenue generated from in-state customers. *Soma Med. Int'l. v. Standard Chartered Bank*, 196 F.3d 1292, 1295-96 (10th Cir. 1999) (quoting *Buddensick v. Stateline Hotel, Inc.*, 972 P.2d 928, 930-31 (Utah Ct. App. 1998)); *see also Smith v. Basin Park Hotel, Inc.*, 178 F. Supp. 2d 1225, 1231 (N.D. Okla. 2001).

Anderson contends—and EER admits—it has contacts with the State of Oklahoma through its operation of oil and gas wells in the state. EER is registered to do business with the Oklahoma Secretary of State; it owns a substantial number of oil and gas interests in Oklahoma dating back over a decade; it advertises that Oklahoma is one of the four states where it operates in excess of 6,000 wells; it has employees and agents in the state to carry out its extensive operations; it travels to Oklahoma on a regular basis for its drilling operations; and it has used Oklahoma courts on numerous occasions, including bringing its own action against an Oklahoma resident. [Dkt. #31, Exs. B-G]. Thus, the court concludes EER has the requisite minimum contacts with Oklahoma to establish general personal jurisdiction.[6]

The court must also, however, determine whether the exercise of personal jurisdiction over EER is reasonable in light of the circumstances surrounding the case. *Omni Holdings*, 149 F.3d at 1091. The court considers five factors to resolve whether the exercise of personal

[6] The court notes, however, that Anderson's claims against EER do not arise out of any of EER's minimum contacts with Oklahoma. Instead, they arise out of EER's role in the alleged breach by EO of its contract with Anderson.

jurisdiction would be reasonable: (1) the burden on the defendant; (2) the forum state's interest in resolving the dispute; (3) the plaintiff's interest in receiving convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental social policies. *Id.* at 1095. Since the court has determined minimum contacts are present, "the burden is on the defendant to present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1102 (10th Cir. 2009). However, the reasonableness prong of the due process inquiry "evokes a sliding scale." *Pro Axess*, 428 F.3d at 1280 (citing *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 210 (1st Cir. 1994)). The strength of the five factors "sometimes serve[s] to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts that would otherwise be required," and "[c]onversely, the factors may be so weak that even though minimum contacts are present, subjecting the defendant to jurisdiction in that forum would offend due process." *OMI Holdings*, 149 F.3d at 1095-96.

**Burden on Defendant**

With respect to the first factor, "[t]he burden on the defendant of litigating the case in a foreign forum is of primary concern in determining the reasonableness of personal jurisdiction." *OMI Holdings*, 149 F.3d at 1096. However, "modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." *Pro Axess, Inc.*, 428 F.3d at 1280 (citing *Burger King*, 471 U.S. at 474). Thus, although forcing EER to litigate this dispute burdens it, the burden is not "gravely difficult and inconvenient." *Pro Axess, Inc.*, 428 F.3d at 1280 (citing *Burger King*, 472 U.S. at 478). The court finds this factor is neutral.

**Forum State's Interest in Resolving Dispute**

"States have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors." *OMI Holdings,* 149 F.3d at 1096. However, the forum state has a reduced interest in providing a forum for dispute resolution when the forum state's law will not be applied. *See Sleepy Lagoon, Ltd. v. Tower Group, Inc.,* 809 Fed.Supp.2d 1300, 1310 (N.D. Okla. 2011) (citing *OMI Holdings,* 149 F.3d at 1096). Because the underlying EO agreement was reached in Texas, principally performed in Texas and allegedly breached by EO in Texas, and because EER's alleged tortious conduct occurred in Texas, it is likely Texas law will apply to resolution of this dispute. Therefore, this factor weighs against exercise of personal jurisdiction over EER.

**Plaintiff's Interest in Receiving Convenient and Effective Relief**

"The third step in [the] reasonableness inquiry hinges on whether the [p]laintiff may receive convenient and effective relief in another forum," and "[t]his factor may weigh heavily in cases where a [p]laintiff's chances of recovery will be greatly diminished by forcing him to litigate in another forum because of that forum's laws or because the burden may be so overwhelming as to practically foreclose pursuit of the lawsuit." *OMI Holdings,* 149 F.3d at 1097. Litigation in this forum would be more convenient for Anderson. However, Anderson has made no showing its chances of recovery in a Texas court will be diminished either because of the forum's laws or because the burden is so overwhelming as to practically foreclose pursuit of the case. As a result, the court finds this factor is neutral.

**Interstate Judicial System's Interest in Obtaining Efficient Resolution**

The fourth factor—the interstate judicial system's interest in obtaining the most efficient resolution of controversies—requires inquiry into the location of witnesses, where the wrong

underlying the lawsuit occurred, what forum's substantive law governs the case, and whether jurisdiction is necessary to prevent piecemeal litigation. *Omni Holdings*, 149 F.3d at 1097. The only witness located in Oklahoma is Sid Anderson. All remaining witnesses, including EO, EER and Carrizo personnel, are in Texas. The agreement was made in Texas; Anderson principally performed its duties in Houston when Sid Anderson met with Carrizo; EO allegedly breached the agreement in Texas; and the alleged wrongful conduct of EER occurred in Texas, where Short threatened legal action if Anderson interfered with closing of the EO sale of properties to Carrizo. Texas law likely governs the dispute. Most importantly, because the court lacks personal jurisdiction over EO, piecemeal litigation of the dispute appears to be inevitable if this court exercises jurisdiction over EER. In contrast, the entire dispute could be resolved in a Texas court. Therefore, the court finds the fourth factor weighs overwhelmingly against this court's exercise of personal jurisdiction.

**States' Interest in Furthering Fundamental Substantive Social Policies**

The court's analysis of the fifth factor focuses on the interests of Texas and the forum state in advancing fundamental substantive social policies. *See OMI Holdings*, 149 F.3d at 1097. Neither party has identified any substantive social policy interests that might be implicated by the exercise of jurisdiction and the court finds that the social policy of any state will not be affected by whether this case is heard in Oklahoma or Texas.

In conclusion, three of the factors—the burden on the defendant, the plaintiff's interest in receiving convenient and effective relief and the states' interest in further fundamental substantive social polices—are neutral. The second factor—the forum's state's interest in resolving the dispute—weighs against exercise of personal jurisdiction. The fourth factor—the interstate judicial system's interest in obtaining the most efficient resolution of controversies—

weighs compellingly against exercise of personal jurisdiction. *See Rusakiewicz,* 556 F.3d at 1102. Therefore, the court finds that the exercise of personal jurisdiction over EER is not reasonable in light of the circumstances surrounding the case.

EER's motion to dismiss for lack of personal jurisdiction is therefore granted.

**V. Conclusion**

For the reasons set forth above, defendants' Motion to Dismiss [Dkt. #30] is granted. The alternative motion to transfer venue is moot. Having granted defendants' motion to dismiss based on lack of personal jurisdiction, the court does not reach the Rule 12(b)(6) motion to dismiss plaintiff's claim for intentional interference with contractual relations.

ENTERED this 8th day of May, 2013.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT